IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 23, 2019 Session

## STATE OF TENNESSEE v. CHAD EDWARD MASSENGALE

**Appeal from the Criminal Court for Hamilton County**
No. 298603     Don W. Poole, Judge

_____

### No. E2018-00387-CCA-R3-CD

_____

The defendant, Chad Edward Massengale, appeals his Hamilton County Criminal Court jury conviction of first degree murder, claiming that the trial court erred by denying the defendant's motion to suppress his statement to the police and by refusing to instruct the jury that a certain State's witness was an accomplice as a matter of law and arguing that the evidence was insufficient to support his conviction. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Steven G. Moore, Chattanooga, Tennessee, for the appellant, Chad Edward Massengale.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Neal Pinkston, District Attorney General; and Cameron Williams and Kevin Brown, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The Hamilton County Grand Jury charged the defendant along with Dekota Ryan Burchard and Roy Lamar Henderson with first degree premediated murder for the December 28, 2015 death of the victim, Tony Rector.

*Factual Overview*

The evidence adduced at the defendant's June 2017 trial established that the victim lived in a garage adjacent to 10965 Dallas Hollow Road and next door to 10961 Dallas Hollow Road. George and Brenda Shadwick lived at 10965 Dallas Hollow Road, and their son, Donny Shadwick, and his girlfriend, Rhonda Martin, lived at 10961 Dallas

Hollow Road. Tiffany Sneed also lived at 10961 Dallas Hollow Road, and her friend, Dekota Burchard, also occasionally stayed at that residence. For some time before his death on December 28, 2015, the victim had engaged in behavior that annoyed the inhabitants of the two Dallas Hollow Road residences. On the evening of December 27, 2015, the victim shared drugs with Ms. Martin and Ms. Sneed, and Ms. Sneed awoke the following morning to find the victim asleep in her lap. At some point that day, Ms. Sneed told Mr. Burchard about the victim's annoying behavior. Meanwhile, Mr. Burchard's girlfriend, Ashley, with whom Mr. Burchard had argued, entered the garage where the victim lived and, according to Ms. Sneed, engaged in sexual relations with the victim. This was, apparently, the last straw against the victim in the minds of the residents of 10961 and 10965 Dallas Hollow Road.

Mr. Burchard telephoned the defendant, a friend of both Mr. Burchard's and Ms. Sneed's, to enlist his assistance in removing the victim from the premises. The defendant, who was at that point traveling in a truck with brothers Nicholas ("Mr. Henderson") and Roy Henderson, III ("Mr. Henderson, III"), agreed to help. The defendant asked Mr. Henderson to drive him to the Dallas Hollow Road residences. When the defendant and the Hendersons arrived, Mr. Burchard and the defendant confronted the victim in the driveway between the two houses. During that confrontation, either the defendant or Mr. Burchard punched the victim, and the victim ran into 10965 Dallas Hollow Road. The defendant, Mr. Burchard, and Mr. Henderson, III, gave chase. The victim was beaten with fists and a tire tool, and Mr. Burchard, Ms. Sneed, and Mr. Henderson, III, carried him to Mr. Henderson's truck at the direction of the defendant. The defendant then directed Mr. Henderson to drive them to the Soddy Presbyterian Cemetery, and the defendant and Mr. Burchard took the victim out of the truck. At some point the victim was cut with a knife, and the defendant "stomped" on the victim's head.

On the following morning, Jeanette Worley discovered the body while she was driving to visit a friend. An autopsy established that the 51-year-old victim died of multiple blunt force and sharp force injuries.

*Trial Testimony*

Tiffany Sneed testified that she had known the defendant for approximately six years and that the two were romantically involved for "a year and a half, two years." She said that, at the time of the offense, she lived with Ms. Martin at 10961 Dallas Hollow Road, which she described as "the little house next to" the residence of George and Brenda Shadwick at 10965 Dallas Hollow Road. The victim lived in the garage of 10965 Dallas Hollow Road and performed "the yardwork and stuff around the Shadwick's home." In the days leading up to the offense, the victim had been engaging

-2-

in behavior that upset the women. Ms. Sneed said that the victim had been "walking in on Rhonda taking a shower, . . . trying to mix her medicine around, trying to come onto the grandmother" and that, on one occasion, "[h]e had a knife out in the kitchen" with Ms. Shadwick. Ms. Shadwick expressed her fear of the victim.

On the evening before the offense, the defendant traded Ms. Martin some Xanax pills for methamphetamine, and Ms. Martin gave Ms. Sneed one of the Xanax pills. Ms. Sneed passed out and awoke the following morning to the victim's sleeping in her lap, which upset her. That same day, Mr. Burchard and his girlfriend, Ashley Sanders, got into an argument, and Ms. Sanders "ended up hanging out at the house and was in the garage with" the victim. Mr. Burchard, who was unhappy with the victim's hanging out with his girlfriend, telephoned the defendant, who arrived approximately 45 minutes later with the Henderson brothers.

According to Ms. Sneed, at that point, "the guys said that they were going to go talk to [the victim] and make him leave, and that's whenever they went to go find [the victim] and it just became a fight." Ms. Sneed recalled that the defendant, Mr. Burchard, and Mr. Henderson, III, whom she knew as "Bubba," found the victim "coming out of the garage going into the house," and Mr. Burchard "hit him and knocked him out with the first punch." The victim "got right back up" and began "yelling back and forth and was going to go in" 10965 Dallas Hollow Road. Mr. Burchard, the defendant, and Mr. Henderson, III, followed the victim into the house, but Ms. Sneed went into 10961 Dallas Hollow Road, and Mr. Henderson "was just standing outside and more or less hanging out by the truck."

When she heard Ms. Shadwick scream "for them to stop," Ms. Sneed went into 10965 Dallas Hollow Road and saw Mr. Henderson, III, standing over the victim "with a four-way, like he was about to hit [the victim] with it." Ms. Sneed recalled having seen both the defendant and Mr. Henderson, III, hit the victim with "the four-way" as the victim lay on the floor. Ms. Sneed denied hitting the victim.

At some point, the defendant instructed Ms. Sneed, Mr. Henderson, III, and Mr. Burchard to move the victim to the bed of Mr. Henderson's truck, and they complied. Ms. Sneed recalled that the victim was alive but making "the snoring sound" when they moved him to the truck. According to Ms. Sneed, she got into the truck along with the defendant, Mr. Burchard and the Henderson brothers, and the defendant and Ms. Sneed provided Mr. Henderson with directions to the cemetery. When they arrived at the cemetery, the defendant and Mr. Burchard got out of the truck and carried the victim from the bed of the truck. At that point, Ms. Sneed heard a sound that sounded like "tree branches breaking." When the two men returned to the truck, the defendant asked Mr. Burchard what he had done with the defendant's knife, and Mr. Burchard said that "[h]e

threw it out because it had blood on it."

The defendant directed Mr. Henderson to drive them back to the two residences on Dallas Hollow Road, and when they arrived, Ms. Sneed, Mr. Burchard, and the defendant attempted to clean the blood in the living room of 10965 Dallas Hollow Road. They burned the victim's clothing in a barrel outside the residence. The defendant and Mr. Burchard changed out of their bloody clothing, and the defendant asked Ms. Sneed to wash his blood-stained jeans. She did not wash the jeans and, instead, turned them over to the police. Ms. Sneed said that Mr. Burchard bleached his shoes to remove the victim's blood.

Ms. Sneed admitted that she did not initially provide the police with an accurate recitation of the offense, saying that she provided only "bits and pieces" of the story because she was scared of the defendant.

During cross-examination, Ms. Sneed said that she moved into 10961 Dallas Hollow Road in the summer of 2015 and that Ms. Martin and Ms. Shadwick began experiencing problems with the victim before Ms. Sneed arrived. She said that, on the day before the murder, the victim "traded Rhonda Xanaxes for meth" and that she "got a Xanax from Rhonda and . . . took one." On the day of the murder, Mr. Burchard's girlfriend, Ashley, dropped him off at the residence and, instead of leaving, went into the garage and had sex with the victim. Ms. Sneed testified that the defendant "was wasted" when he arrived later that evening and that the Henderson brothers were both high on drugs. The defendant and Mr. Burchard told the victim to pack his things and go. Ms. Sneed acknowledged that although Mr. Burchard told her that he threw the first punch, she did not actually see him do so.

Nicholas Henderson testified that on December 28, 2015, he was at his father's office in East Ridge when the defendant "just popped up out of nowhere, knocked on the door." Mr. Henderson's father told Mr. Henderson to "take [the defendant] somewhere, hurry up and get rid of him" "[b]ecause he said he was a bad person." Mr. Henderson drove the defendant and Mr. Henderson, III, in his father's white, four-door GMC truck "to East Brainerd, Sonic, Hixson, Verizon Wireless place, just trying to find somewhere to drop him off." After four or five hours of driving around, the defendant directed Mr. Henderson to drive him to a residence in Soddy Daisy. Mr. Henderson said that he had never been to the residence before.

Mr. Henderson recalled that when they arrived at the residence, Ms. Sneed and Mr. Burchard were standing "[t]owards the end of the driveway." Mr. Henderson said that he stood by his truck while the defendant and Mr. Henderson, III, talked to Ms. Sneed and Mr. Burchard. Ms. Sneed, Mr. Burchard, Mr. Henderson, III, and the

-4-

defendant all walked toward the house to the right of the driveway. At that point, "[a] guy came outside," and the defendant "asked him his name or whatever, and that's when [the defendant] hit him and chased after him, back to the house." Mr. Burchard, Ms. Sneed, and Mr. Henderson, III, gave chase. Mr. Henderson said that he did not follow but instead ran back to his truck because he "was scared" and "didn't know what was going on." He said that he heard "[s]creaming and some yelling" coming from inside the house.

Mr. Henderson said that, a short time later, the defendant "came running out" of the house and "grabbed [Mr. Henderson] by the head or whatever and shook it real hard and said, you know, why didn't you, you know, why did you leave or whatever, and he said, you know, he said you're lucky you're little or I'd hurt you." The defendant told Mr. Henderson to back his truck into the other driveway, and Mr. Henderson complied. The defendant, Ms. Sneed, and Mr. Burchard came out of the house "carrying somebody and they put him in the back of [the] truck." Mr. Henderson testified that the defendant and the others got into the truck, and the defendant told Mr. Henderson to drive. Mr. Henderson said that the defendant directed him to "a pull-off about two or three miles down the road, and apparently it was in front of a cemetery." Mr. Henderson recalled that, during the drive, he "was nervous, shaking, freaking out and stuff."

At the cemetery, the defendant and Mr. Burchard got out of the truck and "unloaded the body." Mr. Henderson said that he looked into his side mirror and saw the defendant "stomping, kicking" the victim through the side mirror. After two or three minutes, the defendant and Mr. Burchard returned to the truck. The party returned to 10965 Dallas Hollow Road, and Ms. Sneed went inside the residence. After 10 or 15 minutes, they all left the residence in Mr. Henderson's truck. Mr. Henderson dropped Ms. Sneed off at a house "about two miles down the road." He dropped the defendant and Mr. Burchard off at a residence in Hixson. Mr. Henderson and Mr. Henderson, III, drove home to East Ridge.

Jeanette Worley testified that she was driving to visit a friend on December 29, 2015, when she observed "a body l[]ying in the middle of that little road" inside Soddy Presbyterian Cemetery. Ms. Worley initially "opened the door and yelled at him, and upon closer look" she "could tell there was no use talking," so she "got back in the car, locked the door and called 911."

Soddy Daisy Police Department ("SDPD") patrol officer Billy Lea responded to Ms. Worley's 9-1-1 call. He observed the victim lying in a pool of what appeared to be blood clothed in socks, underwear, and a T-shirt.

Doctor Steven Cogswell, who performed the autopsy of the victim, testified

that the cause of the victim's death was multiple blunt force and sharp force injuries. Doctor Cogswell said that the victim "had multiple blunt force and sharp force injuries . . . . primarily located in the area of the left side of the face and the left temple" as well as multiple cuts or incised wounds that were inflicted with some blade instrument, a knife of some sort, . . . primarily on the forehead." The victim also "received blows to his mouth, because his teeth had actually cut his lips on the inside, both the upper and lower lip." Doctor Cogswell testified that "at least one of those blows to [the victim's] face was hard enough that the back of the bony eye orbit in the skull actually blew out," creating an "extrusion of the back of the eye socket into the inside of the skull." That injury, which Doctor Cogswell said "could have resulted from a stomp-type injury," "resulted in some bleeding around the brain and brain swelling." The victim's nose was broken, and a cut on the victim's forehead went "all the way down to bone, it goes to the skull." There was "a tearing, crushing injury" on the back of the skull "at the level of the ear."

Two "shallow cutting wounds" formed "an X on the lower chest and abdomen, just at the level of the navel," and another "incised wound . . . cut across the top base of his penis."

Injuries on the victim's back were caused by an object that was "a circular sort of shape that's about an inch in diameter." One injury inflicted with this same object fractured the victim's eighth rib, which then "pushed into the chest cavity and . . . actually lacerate[d] that left lung." This led to the collapse of both of the victim's lungs. Doctor Cogswell testified that the injury to the victim's lung occurred prior to his death because air under his skin indicated that the victim was "attempting to move the chest wall." The victim also suffered "bruising along the spine and the parts of the spine that stick out toward the back."

Doctor Cogswell testified that the victim might have lived had he received prompt medical attention because none of his injuries "would necessarily [have] result[ed] in his very rapid or immediate death." The victim "quite easily, could have been alive for as long as half an hour or so."

SDPD Detective Ryan Wilkey headed up the investigation into the victim's murder. He recalled that the first break in the case came on the evening of December 29, 2015, when another SDPD officer told Detective Wilkey that he had "received a call[] from Judge Marty Lasley, who had received a call from Jim Shadwick, stating that her son Tyler Shadwick, who was then in the Hamilton County jail, told her that Dekota Burchard had beat Tony Rector at the Shadwick residence on Dallas Hollow Road."[1]

---

[1]     Although there appears to be some disagreement in the pronouns, we present Detective Wilkey's statement without alteration.

Detective Wilkey located Mr. Burchard hiding in a bedroom at 10965 Dallas Hollow Road that same day and placed him under arrest.

Detective Wilkey interviewed Ms. Martin, who was married to George and Brenda Shadwick's son Donny, and she told him that Ms. Sneed and the defendant had also been involved in the beating death of the victim. Ms. Martin also indicated that an "individual named Bubba," Michael James, whom she knew as "White Mike," and two other individuals she did not know also participated in the beating.

Detective Wilkey interviewed Ms. Sneed multiple times. On one occasion, Ms. Sneed told him that the defendant had changed clothes at 10961 Dallas Hollow Road and that he had asked her to wash the bloody clothes, but she did not do so. Detective Wilkey and other officers accompanied Ms. Sneed to 10961 Dallas Hollow Road, and Ms. Martin gave them consent to search the residence. While conducting the search at 10961 Dallas Hollow Road, Detective Wilkey observed blood on the doorstep and sidewalk of 10965 Dallas Hollow Road. At that point, Detective Wilkey obtained George Shadwick's consent to search 10965 Dallas Hollow Road. Detective Wilkey testified that a variety of items, including a knife with a red handle that had red spots that appeared to be blood on the blade and a tire tool, were collected from both residences and transported to the Tennessee Bureau of Investigation ("TBI") for testing.

At some point during his investigation, Detective Wilkey traveled to East Ridge to attempt to locate the Henderson brothers. Officers located Mr. Henderson first, and he agreed to come to the police department to be interviewed. Officers found Mr. Henderson, III, "coming out of a motel room" at the Guest House Inn and arrested him on the basis of outstanding warrants unrelated to the homicide. Detective Wilkey recalled that, at the time of his arrest, Mr. Henderson, III, "had marks on his hands, looked like he'd hit something."

Detective Wilkey also interviewed Mr. James, who told the detective that Ms. Sneed had telephoned him on "the night of the actual beating" and told Mr. James "that they had, she was afraid that they had killed someone and that she had hit [the victim] with the tire tool." Mr. James "agreed to wear a wire and to talk to [Ms. Sneed] to see if he could get her to talking about being present and being involved in the beating of" the victim, but nothing came of the information.

Detective Wilkey testified that the police suspected the defendant very early on in the investigation but had difficulty locating him. Officers eventually located him at a residence on Ely Road in January 2016. The defendant was arrested on the basis of an unrelated warrant for his arrest. Detective Wilkey said that he provided *Miranda* warnings to the defendant and that the defendant agreed to waive his constitutional rights

and speak to the detective. Detective Wilkey said that the defendant did not appear to be under the influence of drugs or alcohol.

A video recording of the defendant's interrogation was played for the jury. During his interview, the defendant said that the victim "didn't deserve to die" but "apparently they just took it too far." He initially told Detective Wilkey that he arrived at the residence "about four or five minutes after . . . Tiffany and Bubba loaded him up in the truck. I got there when Tiffany was dragging him out of the f****** house with rubber gloves on, I got there." Later, the defendant admitted that he had planned to "open[] up another trap,"[2] at 10961 Dallas Hollow Road and "get the girls working," saying, "I finally figured out something we can sell. After we sell it, we still f****** got it, you know what I mean?" He said that he told the others that, in order to "make things run smoothly on this, make it really run like it's supposed to, you're going to have to eliminate any, any and every threat immediately," apparently referring to the victim, whom the defendant had seen "disrespect some girls when [he] was there before." He added, "I promise that these mother******* ain't going to come through here and disrespect this s***. It's got, it's gotta start sometime, all right? That's why I dropped that mother****** right where he was at." The defendant acknowledged beating the victim: "I grabbed the guy first, I hit him first, drug him down, knocked him out in the f****** yard, drug his ass in there and then started telling him what to do, threw his ass down. . . . And when we took him to the graveyard and pulled him out, I stomped his head, and that's what killed him. I did it." The defendant insisted that he "didn't mean to kill the man" but admitted that if he "hadn't been an influence on anything, the man would still be alive." The defendant maintained that Mr. Henderson, whom the defendant said "was scared to death" during the offense, "didn't have any hand at all in the physical harm of" the victim.

The defendant told Detective Wilkey that the victim was beaten because he "was disrespecting everybody, you know what I mean? And it was a spot that I was fixing to open up, sell dope out of, okay?" The defendant said that they cut the victim with the knife to "make it look like we did this on f ****** purpose." Although he refused to say who had cut the defendant's penis, the defendant admitted that he told "Bubba" "to cut the motherf***** off." He said they removed the victim's clothes to humiliate him.

Detective Wilkey said that all of the information gathered during his investigation indicated that Mr. Henderson was not a willing participant in the offense but was instead forced by the defendant to drive.

---

[2] The defendant is apparently referring to a house "where drugs were used and prostitution took place." *State v. Whitney Kristina Harris*, No. E2016-00604-CCA-R3-CD, slip op. at 5 (Tenn. Crim. App., Knoxville, July 17, 2017).

During cross-examination, Detective Wilkey testified that he had information that Mr. Burchard had been living at 10965 Dallas Hollow Road. Detective Wilkey confirmed that Ms. Sneed said that the plan was not to kill the victim but to beat him up.

TBI Agent and Forensic Scientist Carrie Schmittgen performed serology and DNA testing on evidence obtained in this case. Her testing established that blood on the piano and carpet inside 10965 Dallas Hollow Road, blood on a "metal transition, door plate step" from 10965 Dallas Hollow Road, and blood on jeans recovered from 10961 Dallas Hollow Road belonged to the victim. Additionally, the victim's blood was found on a pair of K-Swiss shoes recovered from the garage of 10965 Dallas Hollow Road. Agent Schmittgen testified that although there was blood on the blade of the knife, the amount of DNA present was insufficient to obtain a full profile. Limited DNA profiles of two individuals were obtained from the handle of the knife, but neither was sufficient to make a positive identification.

Michael James testified on behalf of the defendant that, on the day of the murder, Ms. Sneed called him "kind of in a panic or whatever" and told him "that they had beat a boy" and that "she hit him with a tire iron." Mr. James said that Ms. Sneed had previously told him that the victim "had been harassing her," but he "didn't think nothing of it." Ms. Sneed "said she was going to have it handled." Mr. James said that on the day following the offense, the defendant telephoned Mr. James and asked for a ride. He picked up the defendant and Mr. Burchard, and the defendant told him "about how they got into a fight and beat a boy up." Mr. James recalled that as they "rode by where supposedly the guy was dropped off at," they saw "the body, and nobody thought that he was going to be dead." The defendant appeared surprised that the victim had died.

Based upon this evidence, the jury convicted the defendant as charged of the first degree premeditated murder of the victim. The trial court imposed a sentence of life imprisonment.

The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal. In this appeal, the defendant asserts that the trial court erred by denying his motion to suppress, by refusing to provide an accomplice instruction as to Mr. Henderson, and by, when exercising its role as 13th juror, finding that there was sufficient evidence to support the jury verdict. The defendant also challenges the sufficiency of the evidence corroborating Ms. Sneed's testimony.

-9-

## I.    Suppression

Prior to trial, the defendant moved the trial court to suppress the statement he provided to Detective Wilkey on grounds that it was obtained in violation of his constitutional rights and that it was not voluntarily made. The defendant asserted that although Detective Wilkey provided him with *Miranda* warnings, he made no affirmative waiver of his rights before the interrogation began. He also claimed that his "posture and speech" during the interrogation "were indicative of extreme weariness or intoxication."

At the hearing on the motion to suppress, Detective Wilkey testified that after suspecting the defendant in the victim's murder, officers "did a ping on his phone" and discovered that the defendant was located in "North Carolina or South Carolina." In January 2016, an individual named Jennifer Gaddis told Detective Wilkey that the defendant had returned to Hamilton County and could be found at a residence on Ely Road. Officers drove by the residence repeatedly until they finally observed the defendant walk out of the residence and get into the passenger's seat of a vehicle. At that point, the officers took the defendant into custody based upon active warrants for his arrest that were unrelated to this case. Detective Wilkey testified that although the defendant was in possession of drug paraphernalia when he was arrested, he did not appear to be under the influence of drugs or alcohol at that time.

After being transported to the police station, the defendant was placed in the interview room with his hands still cuffed behind his back. At some point, the handcuffs were moved to the front of the defendant's body, but he remained handcuffed. At the outset of the recorded interview, Detective Wilkey provided the defendant with *Miranda* warnings. Detective Wilkey testified that he read the warnings directly from a written rights waiver form but acknowledged that he did not ask the defendant to sign the rights waiver form. Detective Wilkey said that, when asked if he understood his constitutional rights, the defendant "nodded his head in a yes fashion" twice. Detective Wilkey noted that the defendant had previously been arrested "20 something times" and had some 23 prior convictions in Tennessee and Georgia.

Detective Wilkey testified that the defendant did not appear to be intoxicated during the interview. He recalled that the defendant was given potato chips and a candy bar to eat and a soda to drink.

During cross-examination, Detective Wilkey acknowledged that the victim's murder was the first homicide case in which he had acted as the lead investigator. He conceded that the defendant did not make "a verbal statement of yes or no" when asked if he understood his rights but maintained that the defendant had nodded his head in the affirmative. Detective Wilkey admitted that he did not ask the defendant

whether he had consumed drugs or alcohol before the interview. When asked if the defendant had slurred speech, Detective Wilkey replied, "I don't know if that would be his speech slurred or not, I hadn't had any dealings with him prior to this, so I don't know how he talks normally."

At the outset of the recorded interview, Detective Wilkey read the *Miranda* warnings to the defendant and then asked, "You know all that good stuff?" At that point, the defendant made a motion with his head that might be a nod, but it is not entirely clear that the motion was in response to the detective's question. After this exchange, Detective Wilkey told the defendant that he would go over the details he had already learned during his investigation and, "[T]hen you can say whatever you want to say." In response, the defendant said, "Go ahead, man." Detective Wilkey gave the defendant a synopsis of the facts as he knew them and encouraged the defendant to tell his side of the story. Although the defendant initially said, "I mean, I would rather not talk to you about that," he did just that. The defendant initially told Detective Wilkey that he had "heard about the situation" but that, "as far as somebody getting assaulted or murdered, I don't know about it." The defendant later admitted that he was at the Dallas Hollow Road residences on the night of the murder but claimed that he arrived after the murder, saying, "Tiffany and Bubba loaded him up in the truck. I got there when Tiffany was dragging him out of the f****** house with rubber gloves on, I got there." He added, "I don't know exactly what all happened before I got there as far as -- but he was beat the f*** out of, you know what I mean?"

As the interview went on, with little probing from Detective Wilkey, the defendant admitted that he had planned to "open[] up another trap . . . right there" and that, in the process of opening the new business venture, the victim was "getting in the way" and "disrespecting everybody." The defendant said that he told "these guys that . . . if we're going to do this and you want to be here with me and make things run smoothly on this, make it really run like it's supposed to, you're going to have to eliminate any, any and every threat immediately, all right?" He described the victim as "a real piece of s***, you know what I mean? Very disrespectful to women, okay?" The defendant said, "I'll tell you exactly what happened, I promise that these motherf****** ain't going to come through here and disrespect this s***. It's got, it's gotta start sometime, all right? That's why I dropped that motherf***** right where he was at. That's where he was gonna belong anyway, all right?" The defendant described the offense:

> But the only person that didn't have any hand at all in the physical harm of that man was Nicko, period. I grabbed the guy first, I hit him first, drug him down, knocked him out in the f****** yard, drug his ass in there and then started telling him what to do, threw his ass down. Do what you do, you

-11-

know what I mean? 'You gonna disrespect my women in here, you're going to get my f****** wallet.' You stop now.

. . . .

. . . . And when we took him to the graveyard and pulled him out, I stomped his head, and that's what killed him. I did it.

The defendant told Detective Wilkey that they stabbed the victim with a knife belonging to the defendant to "make it look like we did this on f ****** purpose." He refused to say who actually cut the defendant's penis but said that he told "Bubba" "to cut the motherf**** off." The defendant asked Detective Wilkey about the charges and potential punishment he was facing as a result of his role in the offense.

Chelsey Mangum testified that the defendant's arrest took place at her house. Ms. Mangum recalled that the defendant "was under the influence, by too many ways," at the time of his arrest. She said that she had seen the defendant with methamphetamine and Xanax on the day of his arrest and that, although she did not see him ingest either drug, she could tell, based on her experience, that the defendant was high when he was arrested. She described the defendant as "[t]oo high," saying, "He was . . . out of it. He couldn't sit still, he was loud, he was just very manic and over-strength and over -- I don't know, I'm sorry, y'all, he was just super high and you could tell it was meth." Ms. Mangum claimed that the defendant had the drugs "in the middle of his pants in a Crown Royal bag" when he was arrested.

During cross-examination, Ms. Mangum said that, on the day of the defendant's arrest, she observed a syringe fall out of the defendant's pocket, but she did not see him inject drugs that day. The defendant did not tell her that he had used drugs that day. She also saw the defendant put "white stuff" that she believed to be methamphetamine and pills "in his Crown Royal bag and he puts the Crown Royal bag like on the buckle of his pants and then flips it in his pants." She did not know for sure what the substances were. She said that, in her experience, the defendant's being high on drugs did not prevent him from communicating or recalling past events.

Based upon this evidence, the trial court concluded that the totality of the circumstances indicated that the defendant had made "an implicit waiver of rights." The court concluded that, "[a]lthough the detective did not try to clarify the defendant's comprehension of his rights, it is reasonable to presume from the defendant's extensive criminal history that he was very familiar with the rights." The court noted that the defendant's "thought and speech do not appear to be impaired." The trial court also found, that, based upon the totality of the circumstances, "the statement in issue was voluntary. The trial court added,

-12-

Although the officer treated the defendant as someone with an extensive criminal history with a presumptive familiarity with *Miranda* rights, the detective also treated the *Miranda* warning and the defendant's comprehension of it as necessary conditions for talking further. Although the defendant was reluctant to speak about the murder himself, the detective did not coerce him to speak about it with threats or promises.

In this appeal, the defendant contends that the trial court erred by denying his motion to suppress, arguing that the trial court erred by finding that he had voluntarily waived his constitutional right to remain silent.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998).

The Fifth Amendment to the United States Constitution provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; *see also Malloy v. Hogan*, 378 U.S. 1, 6 (1964) (holding "the Fifth Amendment's exception from compulsory self-incrimination" applicable to the states through the Fourteenth Amendment). In *Miranda*, the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* To safeguard the privilege against self-incrimination, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.*

Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time

-13-

prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

*Id.*, 384 U.S. at 473-74.

### *A. Invocation*

As is true in cases involving the right to counsel during a custodial interrogation, "an accused who wants to invoke his or her right to remain silent" must "do so unambiguously." *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010).

Here, although the defendant initially said that he "would rather not talk" to Detective Wilkey about the victim's murder, he did not immediately stop speaking but said, "I don't think that -- I heard about the situation, I mean obviously. I mean, apparently I was there the day before or whatever f****** with Tiffany, and -- so they're saying Dekota Burchard, me, Tiffany Sneed and who?" Detective Wilkey attempted to clarify, asking, "So you don't want to talk to me about it?" The defendant replied, "Well, I really, I really, I mean, what would you like me to talk to you about? I really don't know anything to talk to you about as far as -- you know what I mean?" The defendant then began to ramble, saying, "I understand that most of the time whenever these things happen, you, you know the answer before -- you know the answer before you even ask it . . . ." The defendant then warned Detective Wilkey to consider "the credibility of the people that you're listening to." At no other point did the defendant suggest, ambiguously or otherwise, that he wished to remain silent. In consequence, he did not invoke his right to remain silent. *See Berghuis*, 560 U.S. at 382.

-14-

## B. Waiver

Even in the absence of an "invocation of the right to remain silent," a statement made "during a custodial interrogation is inadmissible at trial unless" the State can establish a knowing voluntary waiver of the *Miranda* rights. *Berghuis*, 560 U.S. at 382. "[A] valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." *Miranda*, 384 U.S. at 475. "The State bears the burden of establishing 'waiver by a preponderance of the evidence.'" *State v. Climer*, 400 S.W.3d 537, 564 (Tenn. 2013) (*Berghuis*, 560 U.S. at 384). Although the State need not "show that a waiver of *Miranda* rights was express," the giving of an uncoerced statement following the provision of *Miranda* warnings, "standing alone, is insufficient to demonstrate 'a valid waiver.'" *Id.* (quoting *Miranda*, 384 U.S. at 475).

> The waiver inquiry "has two distinct dimensions": waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."

*Berghuis*, 560 U.S. at 382-83 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *see also Climer*, 400 S.W.3d at 564-65.

"An 'implicit waiver' of the 'right to remain silent' is sufficient to admit a suspect's statement into evidence." *Berghuis*, 560 U.S. at 384 (quoting *North Carolina v. Butler*, 441 U.S. 369, 376 (1979)). To establish "an implied waiver of the right to remain silent," the State must show "that a *Miranda* warning was given and that it was understood by the accused." *Berghuis*, 560 U.S. at 384. "As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Id.* at 385 (citations omitted).

Here, the record establishes that Detective Wilkey read the *Miranda* warnings to the defendant from a printed rights waiver form and asked the defendant, "Do you understand what your rights are?" and "You know all that good stuff?" The defendant, who had previously been arrested more than 20 times, responded to both questions with a motion that might be interpreted as a nod. More importantly, however, after Detective Wilkey indicated that he would provide a brief recap of the case before giving the defendant an opportunity to "say whatever you want to say," the defendant

-15-

responded, "Go ahead, man." This evidence establishes that the defendant voluntarily waived his constitutional rights.

## II. Testimony of Mr. Henderson

The defendant next contends that the trial court erred by refusing to instruct the jury that Mr. Henderson was an accomplice.

An accomplice is an individual who knowingly, voluntarily, and with common intent participates with the principal offender in the commission of an offense. *State v. Lawson*, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). "When the facts concerning a witness's participation are clear and undisputed, the trial court determines as a matter of law whether the witness is an accomplice." *State v. Robinson*, 146 S.W.3d 469, 489 (Tenn. 2004) (citing *Ripley v. State*, 227 S.W.2d 26, 29 (1950); *State v. Perkinson*, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992)). When "the facts are disputed or susceptible to different inferences," however, the determination of whether the witness is an accomplice is a question for the trier of fact. *Robinson*, 146 S.W.3d at 489 (citing *Perkinson*, 867 S.W.2d at 7); *see also Conner v. State*, 531 S.W.2d 119, 123 (Tenn. Crim. App. 1975). "The test generally applied is whether the witness could be indicted for the same offense charged against the defendant." *Robinson*, 146 S.W.3d at 489 (citing *Monts v. State*, 379 S.W.2d 34, 43 (Tenn. 1964)).

As an initial matter, we note that the defendant did not ask the trial court to instruct the jury that Mr. Henderson was an accomplice, and he offered no argument in favor of an instruction when prompted by the trial court. Before he will be entitled to relief, a defendant challenging the omission of an instruction must make a special request that the instruction be given or otherwise object to the omission. *See* Tenn. R. Crim. P. 30(a), (b); *State v. Cravens*, 764 S.W.2d 754, 757-58 (Tenn. 1989); *State v. Haynes*, 720 S.W.2d 76, 84-85 (Tenn. Crim. App. 1986); *Bolton v. State*, 591 S.W.2d 446, 448 (Tenn. Crim. App. 1979). The defendant did raise the issue in his motion for new trial.

Waiver notwithstanding, the record supports the ruling of the trial court. The undisputed evidence in this case established that Mr. Henderson was not an accomplice in the victim's murder. Mr. Henderson testified that he had never been to either Dallas Hollow Road residence, that he had never met the victim, that he did not know why the defendant wanted to go to Dallas Hollow Road, that he did not participate in the beating of the victim, and that he only agreed to drive to the cemetery because he was afraid of the defendant. Ms. Sneed maintained that Mr. Henderson stayed by his truck during the assault on the victim, that he appeared frightened, and that he drove the truck to the cemetery because the defendant forced him to do so. The defendant told

Detective Wilkey that Mr. Henderson "didn't have any hand at all in the physical harm of that man." The defendant is not entitled to relief on this issue.

### III. Sufficiency

Finally, the defendant challenges the sufficiency of the convicting evidence, arguing that "the only evidence the State produced at trial implicating [the defendant] was the testimony of Tiffany Sneed and Nick Henderson," who were accomplices to the crime.

Before we review the sufficiency of the convicting evidence, we note that the defendant has also asked this court to overturn the trial court's approval of the verdict in its role as 13th juror. Our supreme court has observed that, when exercising his role as 13th juror, "[t]he trial judge is in a position to *weigh* the evidence because he or she was present for the testimony and so had an opportunity to determine credibility." *State v. Stephens*, 521 S.W.3d 718, 727 (Tenn. 2017) (emphasis added). In so doing, "'[t]he trial judge does not have to view the evidence in the light most favorable to the prosecution'" but "'may weigh the evidence himself as if he were a juror.'" *Id.* at 727 (quoting *State v. Ellis*, 453 S.W.3d 889, 899 (Tenn. 2015)). "A trial judge's position is in stark contrast to an appellate judge's, whose review of the case is limited to the cold written record of the trial" and who must view the evidence in the light most favorable to the State. *Stephens*, 521 S.W.3d at 727. Because "[a]ppellate courts are ill-suited . . . to assess whether the verdict is supported by the weight and credibility of the evidence," "the accuracy of a trial court's thirteenth juror determination is not a subject of appellate review." *State v. Moats*, 906 S.W.2d 431, 435 (Tenn. 1995) (citing *State v. Burlison*, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993)). "[O]nce the trial court approves the verdict as the thirteenth juror and imposes judgment, the review of the evidence on appeal" is limited to the consideration of the legal sufficiency of the evidence. *Burlison*, 868 S.W.2d at 719.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the

-17-

evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[f]irst degree murder is . . . [a] premeditated and intentional killing of another." T.C.A. § 39-13-202 (2006). As used in the statute,

> "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d).

Noting that "[p]roof of premeditation is inherently circumstantial," this court has observed that "[t]he trier of fact cannot speculate what was in the killer's mind, so the existence of premeditation must be determined from the defendant's conduct in light of the circumstances surrounding the crime." *State v. Gann*, 251 S.W.3d 446, 455 (Tenn. Crim. App. 2007). Thus, when evaluating the sufficiency of proof of premeditation, the appellate court may look to the circumstances surrounding the killing. *See, e.g.*, *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Coulter*, 67 S.W.3d 3, 72 (Tenn. Crim. App. 2001). Such circumstances may include "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime[;] and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660.

The evidence adduced at trial established that Ms. Sneed and Mr. Burchard were fed up with the victim and that they called the defendant to help them get the victim to leave. Mr. Henderson confirmed that, after receiving a telephone call, the defendant asked him to drive him to the Dallas Hollow Road residences. Both Ms. Sneed and Mr. Henderson testified that the assault on the victim began shortly after the defendant's arrival, a fact confirmed by the defendant's statement to Detective Wilkey. Testimony from Doctor Cogswell about the victim's injuries corroborated Ms. Sneed's testimony

-18-

that the victim was beaten with a "four-way" or tire tool. By the time he was dumped at the cemetery, the victim had been beaten with fists, resulting in a broken nose and a variety of bruises on his face, and with a tire iron, resulting in a broken rib and a collapsed lung. Ms. Sneed and Mr. Henderson indicated that the victim was barely clinging to life when they arrived at the cemetery. Mr. Henderson testified that the defendant then stomped on the victim's head, and the defendant told Detective Wilkey, "I stomped his head, and that's what killed him." Doctor Cogswell testified that the blow-out fracture of the victim's skull could have been caused by a stomp-type injury. In our view, this evidence was sufficient to support the defendant's conviction.

## IV. Conclusion

Based upon the foregoing analysis, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE